COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS                                    CIVIL ACTION NO. 17-0512 D

| | |
|---|---|
| LUKE DEPTULA | ) |
| | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| CITY OF WORCESTER, JEFFREY CARLSON, | ) |
| JAMES E. BATES, KELLEN E. SMITH, | ) |
| SGT. MATTHEW EARLY, DANA RANDALL, | ) |
| LARRY WILLIAMS AND GARY GEMME | ) |
| | ) |
| Defendants | ) |
| | ) |

**RECEIVED**

**MAR 30 2017**

**CLERK OF COURTS
WORCESTER COUNTY**

## PLAINTIFFS' COMPLAINT AND REQUEST FOR JURY TRIAL

### INTRODUCTION

1.   This is an action in civil rights and tort to recover for assault and battery against the

plaintiff Luke Deptula ("Mr. Deptula") by Worcester police officers who without legal

cause or excuse grabbed him by the throat, violently restrained him, placed him in

handcuffs and then pounded him repeatedly in the head with a closed fist. The conduct

of the assailants officers, defendants James Bates and Jeffrey Carlson, took place in the

presence of, and was aided and abetted by, defendants Dana Randall, Larry

Williams, Kellen Smith, Sgt. Matthew Early, and on information and belief other

officers as well.  The conduct resulted from the failures of the defendant City of

Worcester and of its police chief at the time, defendant Gary Gemme, to institute

necessary policies and procedures governing conduct of police officers and to properly

train, supervise, and discipline its officers in the lawful use of force.

## JURISDICTION

2.    The action asserts claims under 42 U.S.C. § 1983 for violation of the plaintiff's rights under Fourth and Fourteenth Amendments to the United States Constitution,  as well as claims under state statutory and common.

3.    This Honorable Court has original jurisdiction of this action the action pursuant to M.G.L. c. 212, §§ 3 & 4

## PARTIES

4.    Plaintiff is and was at all pertinent times a resident of Worcester, Massachusetts.

5.    Defendant Officer Jeffrey Carlson ("Carlson") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in █████████████

6.    Defendant Officer James E. Bates ("Bates") was as at all pertinent times a duly appointed and sworn Worcester police officer, and he resides at ████████████████

7.    Defendant Officer Kellen E. Smith ("Smith") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in ████████████

8.    Defendant Officer Dana Randall ("Randall") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in ████████████

9.    Defendant Officer Larry Williams ("Williams") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in ████████████

10. Defendant Officer Matthew C. Early, Sr. ("Early") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in ▮▮▮▮▮▮▮▮▮

11. Defendant Officer Gary Gemme ("Gemme") was at all pertinent times a duly appointed and sworn Worcester police officer and Chief of Police at all times material to this complaint. He resides in ▮▮▮▮▮▮▮▮▮

12. Each of the aforementioned defendants is sued in his individual capacity.

13. Defendant City of Worcester ("The City") is a duly chartered municipal corporation of the Commonwealth of Massachusetts with a place of business abode located at 455 Main Street, Worcester, Worcester County, Massachusetts.

## FACTS

14. Each of the previous paragraphs is incorporated as if fully set forth herein.

15. At all pertinent times each individual defendant acted under the color of law with the powers and authority of a police officer under the law of Massachusetts and/or the ordinances, regulations, and policies of the City of Worcester.

16. At all pertinent times as Chief Gemme exercised authority over the Worcester Police Department ("WPD") and its officers, and he was a maker of WPD policy as to standards of conduct and discipline within the department.

17. At all pertinent times Chief Gemme had a duty to exercise oversight and control over the use of force by WPD officers and to hold them accountable for any use of excessive force, for misstatements of fact in official reports, or other serious misconduct, and he had authority to discipline and/or to effectively recommend the dismissal of officers for

3

serious misconduct.

18.     In 2013 Smith stopped Deptula on several occasions and searched him and his vehicle
without a warrant.

19.     During one of these stops after the searches Smith told Deptula he would find him
another day and would bust him.

20.     Smith wanted Deptula to work for him as an informant in drug investigations.

21.     On March 31, 2014, Smith and a group of WPD vice officers including Defendants
Bates, Carlson, Williams, Randall and upon information and belief Sgt. Early and officers
Hanlon and O'Malley were following Deptula in undercover police vehicles.

22.     The officers, apparently waiting for a warrant to search for Deptula's apartment as well
as his car, followed him as he left his mother's house at Santoro Road and drove to a
mechanic's shop at 598 West Boylston Street to have his tires changed and for brake
repair.

23.     Smith ordered the other co-defendants to stop and search Deptula and to detain him while
they waited for issuance of a warrant.

24.     Deptula had pulled onto the mechanic's lot and was waiting at his vehicle when he
noticed a pick-up truck pull in close to his car.

25.     Deptula was smoking a cigarette when this happened.

26.     Bates, who was in plainclothes and was unknown to Deptula, got out of the truck and
without identifying himself as an officer and without cause ran at Deptula, grabbed him
by the throat, and forced him onto the hood of the car.

27.     Bates was quickly joined by Carlson, Randall, Williams, and other officers, including on
information and belief, Early, Michael Hanlon and Martin F. O'Malley.

28.   Officers restrained Deptula on the hood of his car, and handcuffed and searched him and searched his car but found no contraband.

29.   Smith arrived at the scene and Deptula asked him "what the hell is going on" and heard an officer who had been involved in the search say to Smith that "there is nothing here."

30.   Deptula then heard Bates add: "because he ate something."

31.   Carlson then said to Deptula, "You ate them all you fucking pussy?" and without warning punched Deptula twice in the area of the right ear in the presence of the other officers.

32.   Deptula had not swallowed any drugs.

33.   Deptula, stunned and staggering, yelled, "Did he just hit me?" and Bates replied "No, nobody hit you buddy."

34.   Bates brought Deptula up from the hood of his car at which timer Carlson punched Deptula twice more again in the right ear area.

35.   Deptula yelled "What the hell are you doing… why did you punch me on my face?"

36.   Carlson intended for his actions to cause Deptula pain, humiliation, degradation and a high probability of injury.

37.   No reasonable officer would have done what Carlson did to Deptula and doing so served no legitimate purpose.

38.   Randall, Williams, Bates, and Early did not say or do anything to stop Carlson's repeated batteries on Deptula but instead they enabled and condoned the assaults by keeping Deptula in custody.

39.   There were no justifications for the conduct of these defendants.

40.   Smith then grabbed Deptula, placed him in the cab of the pick-up truck and drove to Deptula's apartment at 3 Millbrook Street.

41.   During the ride, as Deptula leaned over in pain, Smith asked him why, and Deptula said
      he had been punched -- whereupon Smith menaced him with a closed his fist and yelled,
      "Good, do you want me to punch you now?"

42.   By his conduct Smith did assault Deptula by placing him in fear of imminent battery.

43.   No reasonable officer would have threatened a handcuffed arrestee in this manner and
      doing so served no lawful purpose.

44.   The officers held Deptula at his apartment and held him there, with no offer of medical
      attention, while they searched.

45.   Later Deptula was brought to the WPD for booking and upon information and belief was
      not offered any medical care for the injuries inflicted despite the fact that Carlson and
      Bates had battered him.

### WPD had no Drug Ingestion Policy and did not train officers in drug-ingestion dangers or counter-measures

46.   When Bates grabbed Deptula by the throat and swung him to the hood of the car he used
      force to arrest Deptula.

47.   At that time WPD Policy 400 required that an officer's use of force "must be objectively
      reasonable in consideration of the officer's perception of the risk/threat presented and the
      officer's perception of the subject's action(s)."

48.   The policy also required every police officer that used force to prepare a report
      documenting his/her conduct.

49.   The WPD use of force policy from the date of Deptula's arrest to the present, gave no
      direction or guidance as to the type or degree of force an officer may use to keep an
      arrestee from swallowing drugs or contraband.

50. Before Deptula's arrest the City, Early and Gemme knew that WPD officers and vice squad detectives were likely to encounter individuals during traffic stops, Terry stops or arrests who if they had illegal drugs on their persons would be likely to attempt to hide or dispose of contraband by placing it in the mouth and/or by swallowing it.

51. At all pertinent times the City, Gemme and Sgt. Early knew these incidents occurred frequently because of the high incidence of drug abuse and arrests in the City, and they knew of the resulting risks of loss of evidence and medical risk to persons from swallowing a supply of drugs rather than a single dose.

52. It is in part due to knowledge of the risks of overdose from attempts to swallow and hide contraband that in 2014 the city adopted a Naxolone (Narcan) Administration policy, Policy No 831, making this narcotics antidote available for administration by first responders in acute overdose cases.

53. When Deptula was assaulted by Bates and Carlson, it was common practice within the WPD in general and within the narcotics unit in particular to use force to remove contraband objects or substances from an arrestee's mouth.

54. At all times material to this complaint the force used in these situations varied from verbal commands to spit out the drugs or contraband, to pinching the person's nose, to applying pressure to sensitive spots in the jaw and ear area, to the use of choke holds, and punching an arrestee to try and force the contraband out.

55. At all pertinent times the City and Gemme knew that the actions/inactions of officers relating to persons swallowing drugs or contraband could have serious physical, medical, professional and/or legal consequences.

56.     Despite knowing that such circumstances were common and foreseeable, neither the City nor Gemme issued any policy or provided any training to offices to deal with such incidents.

57.     The lack of policy and training evinces deliberate indifference to the rights and safety of arrestees and to Deptula's rights.

58.     Other police departments throughout the United States have had drug-ingestion policies whose primary objective is the safety, health and well-being of officers and arrestees.

59.     Existing drug-ingestion policies developed by other police departments generally assume that anything ingested by an arrestee during or as a result of an arrest is dangerous, the situation must be managed medically and the ingested materials should be removed safely.

60.     Drug ingestion policies typically provide that officers will not use physical force in an attempt to open and remove anything from an arrestee's mouth.

61.     Instead, drug-ingestion policies immediately consider the swallowing of drugs as medical emergencies that require supervised transportation to a medical facility.

62.     When Deptula was assaulted by Bates and Carlson the WPD had no policy that provided for an alternative to forceful physical attempts to open an arrestee's mouth to remove harmful, dangerous drugs or other evidentiary items.

63.     Because there was no such policy in place the alternative almost invariably resulted in the use of force and a resulting variety of injuries to arrestees.

64.     The lack of policy was the moving force that resulted in Deptula's injuries.

### Bates, Carlson, Smith, made up a story to justify Deptula's beating

65.     Despite the fact that Bates grabbed Deptula by force and used force, he did not prepare an

incident report to document and justify the level of force he used.

66.    The WPD policy then and now required him to do so.

67.    Without documentation on the use of force by field officers, supervisors and policy-makers are unable to know the extent to which officers use force during arrests or during encounters with civilians.

68.    Over the years many officers from regular and from the narcotics units have continued to use force without being required to prepare police report documenting the force used.

69.    Carlson, Smith and Sgt. Early -- only three of at least six officers involved -- prepared reports that discussed the force used to arrest Deptula.

70.    Sgt. Early prepared his report months after the incident.

71.    Carlson prepared a false report claiming that when Bates approached him Deptula "[p]ulled his fake thumb off and I observed him place multiple, small light colored items into his mouth. Based on my experiences and the information learned through the investigation, I believed Deptula was attempting to ingest illegal pills."

72.    Carlson also falsely reported that as Bates forced Deptula to the hood of the car "I then delivered two open palm strikes to the right side of his face in an effort to dislodge the evidence. Deptula was chewing and swallowing pills causing a white chalky substance to be visible on his lips and tongue. We placed Deptula in handcuffs and I asked if he wanted medical attention, he declined."

73.    Each of these statements about Deptula trying to swallow pills, the reason for Carlson striking him and the offer of medical attention is false.

74.    Smith and Sgt. Early parroted the falsehoods in their official reports knowing they were false.

75.   Smith's report also stated falsely that officers had ordered Deptula out of his car before arresting him and that afterwards Deptula told them he was un-injured and declined medical care.

76.   As a result of the Defendants actions plaintiff suffered great pain of body and mind and great and emotional distress.

### A longstanding patently unconstitutional use of force policy

77.   The use of excessive force with impunity in the WPD was at all pertinent times part and parcel of the general *de facto* policy, custom, practice and usage that gave officers extreme and unwarranted discretion in the use of force without requiring them to account for the same.

78.   As a matter of policy the supervisory/policymaking defendants accorded this prerogative in particular to members of special WPD units, including the vice squad and the SWAT team.

79.   As a matter of policy the supervisory/policymaking defendants did not substantively monitor, assess, or regulate the use of force by WPD officers but sought to maintain the appearance of doing so.

80.   As a matter of policy the supervisory/policymaking defendants did not initiate inquiry into the cause of serious physical injuries to persons in WPD custody – no matter how evident an arrestee's injuries might be at booking or how clearly the arrestee stated a claim of physical abuse, and regardless of medically diagnosed injuries not adequately explained (if at all) in arresting officers' reports.

81. As a matter of policy the supervisory/policymaking defendants did not in any way take notice of or action regarding an officer's possible use of excessive force unless the alleged victim submitted a formal complaint in writing to the WPD.

82. As a matter of policy the supervisory/policymaking defendants, in doing show investigations into formal written complaints of physical abuse, treated officers' accounts of the incidents as authoritative regardless of physical evidence or testimony to the contrary.

83. Although the supervisory/policymaking defendants treated officer accounts of violent incidents as authoritative, as a matter of policy they did not investigate circumstances suggestive of untruthful reporting – in particular the systematic and customary false reporting and non- reporting of excessive force by officers who perpetrated it and also by those who witnessed it.

84. The policy is evident in WPD investigation of written complaints in which accused officers and officer witnesses submitted only written statements without being interviewed while complainants were subject to adversarial interrogation by WPD officers.

85. The policy is evident in Chief Gemme's practice at all pertinent times of clearing officers of excessive force complaints if complainants refused interrogation -- even when excessive force victims submitted detailed written statements and notwithstanding that Chief Gemme required only written statements from accused officers without their being interviewed, and notwithstanding that the WPD's stated policy called for it to accept "an affidavit or other form of written statement" from civilian witnesses.

86. The policy is evident in Chief Gemme's practice of not investigating excessive force incidents when the alleged victims refused interrogation but were later examined exhaustively under oath after they filed lawsuits, and the written transcripts of their testimony were available to him.

87. The policy is evident in the WPD practice of generating and filing of vague, perfunctory use of force reports and injured prisoner reports to convey an impression of oversight while the reports in fact did not enable substantive review of officers' conduct and were ignored by Chief Gemme, except for his review of meaningless statistical summaries.

88. The policy is evident from the fact that in cases of serious injury, such as broken facial bones, at all pertinent times there was no review at the WPD of officer reports, booking videos, or medical records to see if officers plausibly accounted for diagnosed injuries.

89. The policy is evident from the fact that no supervisory/policymaking defendant or designee sought to track the types or severity of injuries prisoners sustained or to compare them to officer accounts of the incidents, notwithstanding that the injuries included broken teeth, skull fractures and other serious head injuries such as facial fractures, broken jaw bone and broken noses as well as broken ribs, a ruptured bladder in one case, and other disabling injuries.

90. The policy is evident from the fact that at all pertinent times the supervisory/policymaking defendants failed to require training of booking officers and their superiors to inspect for and to document prisoner injuries, as required by the Massachusetts injured prisoner statute, M.G.L. c. 276 § 33.

91. The policy is evident from the fact that at all pertinent times video surveillance systems covering the WPD lockup did not cover certain "dead spots" at the facility where the

conduct of officers toward arrestees went unrecorded.

92.   The existence of a practice of doing nothing about the use of excessive force without a
      victim's complaint was confirmed when an officer battering a handcuffed suspect at the
      WPD lockup in the presence of other officers and a supervisor and part of the incident
      was captured on the lockup video system on December 1, 2014.

93.   True to form, the WPD did nothing in response to the incident until after a formal
      complaint was submitted in mid-March of 2015; only then was the offending officer,
      Michael Motyka, suspended from duty and arrested on assault and battery charges.

94.   To date, on information and belief, no other officer present at the time of the beating was
      disciplined relating to that previously noted incident.

95.   The policies of not investigating circumstances suggesting use of excessive force and of
      doing non-substantive show investigations in response to written complaints is evident
      from the acts and omissions of Chief Gemme, the City and more recently of Mr.
      Augustus relating to numerous allegations of excessive force in complaints to the WPD
      and in suits by the alleged victims.

96.   In virtually every case where the WPD investigated allegations of excessive force against
      a police officer it has found the allegations to be unsubstantiated.

97.   At all pertinent times Detectives Carlson, Bates, their co-defendants and other members
      of the vice squad were aware from their own experience of lax policies and practices of
      their organizations regarding the use of force and reporting of the use of force.

98.   In addition, there have been numerous civil rights lawsuits against Worcester police
      officers that allege physical abuse, serious injuries and or instances of malicious
      prosecution, false statements and trickery that have not resulted in any discipline.

99.    By way of example, in *Mangual v. City of Worcester, et al,* US District Court, CA No. 4:15-cv-40017-TSH, plaintiff alleged that he was beaten by a group of vice squad detectives before being arrested, and while in custody by Kellen Smith and another officer in the presence of Sgt. Early as Mr. Mangual was handcuffed during the execution of warrantless body cavity search.

100.   A video captures certain images of the incident but more importantly Mangual can be heard complaining of being abused.  During Mangual's warrantles strip and cavity search, Mangual demanded to be videotaped but police refused.

101.   During Mangual's warrantless strip and cavity search Mangual can be heard screaming while being abused and saying things like: "You keep slamming me on my face" or saying "Yeah, you're not going to beat me up, ah? Beat me up in front of the camera" or "You mother fucking…There's no reason for you guys to be fucking hurting me… bro" only to be told by Sgt. Early "Nobody did that."

102.   In *Hickson v. City of Worcester, et al*, US District Court, CA No. 4:14-cv-40069-TSH, Hickson alleged that he was beaten during his arrest, intentionally thrown inside a police cell while handcuffed causing him to have a laceration in his forehead and 7 staples to repair them. He also alleged he was assaulted by two other officers at the time of his arrest and while being treated at the hospital by another WPD officer.

103.   After Hickson filed a complaint with the WPD Bureau of Professional Standards ("BOPS") regarding his assault and was interviewed he was told by one of the investigating officers "forget" about his complaint and no one notified him of the outcome of his complaint.  No officer was disciplined.

104.   In *Nga Truong v. City of Worcester*, *Gary Gemme, et al,* US District Court, CA No. 1-12-

cv-1222, Truong, alleged that detectives procured a false confession by using false promises and trickery that resulted in her wrongful pretrial incarceration for a period of close to two years.

Specifically, a Worcester police detective now employed by the WPD BOPS was sued for lying to a teenager that there was scientific linking her to the death of her child when he knew that claim to be patently false. A Worcester Superior Court Judge ruled in connection with a motion to suppress that Detective's Pageau's testimony was "simply not credible" as she described his conduct a "combination of trickery and implied promises." And she also described that police repeatedly confronted Ms. Truong with "knowingly false statements …" Instead of firing detective Pageau, Gemme allowed him to transfer to the Worcester police BOPS to investigate complaints of police misconduct.

105.    In June 30, 2016 the City Manager of the City of Worcester issued a press release, stating the City agreed to pay $2.1 Million to settle Ms. Truong's federal civil rights lawsuit.

106.    In *Ramirez v. City of Worcester, Gary Gemme, et al*, US District Court, CA No. 4:14-cv-40054-TSH, the plaintiff alleged his jaws were broken and wired and his teeth broken during a warrantless search and seizure back in July 2011 involving two vice-squad detectives who he alleged filed false reports.

107.    Ramirez alleged he was assaulted by officers Randall and Williams, two co-defendants in Deptula's case. Although Gemme and the commanding officer of the BOPS were shown police records and Ramirez' booking tape in 2013 they did nothing to investigate his case until Ramirez filed a lawsuit against the City and Gemme.

108.    In *Sanabria v. the City of Worcester, Gary Gemme, et al.*, US District Court, CA No. 4:12-cv-40083 TSH, Sanabria alleged he had to undergo a surgical reconstruction of his

zygomatic bone (eye socket) after being assaulted by members of the WPD in July 2009 and no one was disciplined.

109.   In *Lopez v. the City of Worcester, Gary Gemme et al.*, US District Court, CA No. 4:12-cv-40078 TSH, Lopez alleged he had to have surgical reconstruction of his nasal bone after being beaten two police officers in June 2009.  Lopez told police during booking he had been assaulted by police but his complaint was not investigated until he filed a court case. No one was disciplined.

110.   In *Lora v. City of Worcester, et al*, US District Court CA No. 4:13-cv-40131 TSH, Lora alleged that he was strip searched without a warrant and viciously assaulted during a drug raid conducted by members of the Worcester Police vice-squad, i.e. he alleged that he was struck in the face and ribs with fists and a large chunk of hair was pulled from his scalp in April 2011.

111.   In 2015 the City paid Lora $36,000 to settle his federal civil rights lawsuit but no one was disciplined.

112.   In *Nicasio v. the City of Worcester, Gary Gemme et al*, US District Court CA No. 4:12-cv-40079 TSH, Nicasio alleged that as a result of a police encounter during a domestic incident sustained facial fractures when three officers beat him and lied about the nature of their encounter during a domestic incident in June of 2009.  Officers excluded any mention of Nicasio in their reports and denied touching him. No one was disciplined.

113.   In *Daisy Morales v. City of Worcester, et al*, US District Court CA No. 4:14-cv-40017 TSH, Morales an elderly woman alleged that her beating resulted in life-threatening permanent injuries that have required extensive surgical procedures as a result of an arrest during February 2013.  Morales also alleged that the arresting officer also told her

"I'm sick of dealing with you Latinos."

114. In *Ortiz v. Sgt. Steve Roche, et al*, US District Court, CA No. 4:15-cv-40037-TSH, plaintiff, a livery driver at work who was arrested but never charged with any crime, alleged that he was intentionally pistol whipped during a drug raid by a police Sergeant during a vice-squad drug raid that occurred in Worcester in March 2014.

115. Ortiz alleged defendants falsely reported how he got injured (i.e. Sgt. Roche falsely alleged that Ortiz disobeyed police orders and that as the detective extended his weapon towards Ortiz, Ortiz "quickly turned towards [Sgt. Roche] striking his eye lid on my weapon." Ortiz was notified by Chief Gemme that his pistol whipping was justified, i.e. "It has been established that your complaint is exonerated in part, i.e. the act(s) occurred but the actions of the officers were justified, lawful and proper..."

116. In October 2015 the City paid Morales $125,000 to settle her federal civil rights lawsuit but no one was disciplined.

117. On January 28, 2013 the City agreed to make a settlement payment of $486,000 to Brandon Blair, and Richard Tousignant after a federal jury found they had violated their civil rights and a jury assessed punitive damages against few officers which the City paid. *Blair et al. v. Towler, et al*, US District Court CA No. (4:11-cv-40113-TSH, doc. 61-3). No one was disciplined.

118. In *Murphy v. The City of Worcester, et al*, US District Court CA No. 1:14-cv-14298 LTS, Murphy alleged he suffered facial lacerations from having his head punched repeatedly and slammed into the paved sidewalk during an arrest by officer Spalatro in December 2011. The City paid monies to Murphy and no one was disciplined.

119. In a recent federal civil rights lawsuit settled by the City of Worcester in 2011, the

plaintiff alleged that during the execution of a search warrant for drugs conducted by members of the gang unit an "officer used the butt of his pistol to repeatedly strike Muniz on the head." Muniz also alleged that the pistol-whipping split the skin behind his ear badly lacerating it. His leg was broken as well, according to the complaint. *Muniz v. City of Worcester, et al*, US District Court CA No. 4:09-cv-11950-FDS.

120. In 2011 the City paid Muniz $40,000 to settle his federal civil rights lawsuit. No one who came in contact with Muniz was ever disciplined.

121. Detectives Carlson and other detectives from the MSP also falsely claimed that a man they arrested and badly injured in 2012 had been trying to swallow a packet of narcotics, but this was shown by a video recording to be patently false. *Ruiz v. The City of Worcester, Jeffrey P. Carlson, Trooper Nicholas Nason et al*, US District Court, CA No. 4:15-cv-40076-TSH.

122. Ruiz alleged in his complaint that Carlson repeatedly called him demeaning words: Carlson called him a "cunt" and said "We eat pieces of shit like you for breakfast."

123. The WPD Chief recently exceptionally cleared Carlson for using excessive force against Ruiz.

124. Moreover, Carlson has also been associated with other lawsuits that accuse members of the vice-squad and him of misconduct.

125. In *Santamaria v. City of Worcester, et al*, Worcester Superior Court, 1785CV00117 in which it is alleged that after an arrestee was beaten by officer Randall, the plaintiff alleged Carlson made racially derogatory comments regarding his Italian descent, like "You are fucking pussy. I will make sure your bail will be Fifteen-Thousand, this ought to cost you Twenty-Five thousand for a lawyer you fucking grease ball. If I had my way,

I put every one of one of you grease balls in jail." Carlson continued "You are going to jail, you fucking pussy."

126.    Carlson has also fabricated evidence in other criminal cases and made false claims in police reports even when video surveillance contradict his false reports.

127.    During a 2012 arrest Carlson punched a citizen in the head in front of vice squad supervisors even though the person arrested was already in custody and handcuffed.

128.    And yet Gemme and the City condoned this widespread violation of Massachusetts law as well as WPD's own internal policies.

129.    In *Diaz v. City of Worcester, et al*, US District Court CA No. 4:16-cv-40039-TSH, plaintiffs were roused at 5:15 AM on August 19, 2015 without warning, cause or excuse, and they were assaulted and threatened at gun point during botched SWAT raid for guns and drugs even when the target of the raid had moved out of that apartments months before. No one was disciplined as a result of the raid.

130.    In *Rivera v. City of Worcester, et al* US District Court CA No. 4:17-cv-40029-TSH, plaintiff alleged that he was beaten by Worcester narcotics officers during a drug raid in which other arrestees were beaten while being stripped searched, policed used racially derogatory language and one of the occupants alleged police confiscated from him more money than they reported. No police officer was ever disciplined.

131.    In *Burgos-Martinez v. City of Worcester, et al* US District Court CA No. 4:16-cv-40128-TSH, members of the gang unit executed a search warrant in plaintiff's apartment as a result of a drug investigation which targeted plaintiff's son who had recently moved to his father's apartment. Plaintiff alleged he was beaten, put on a chokehold and was punched and kicked. The officer that beat Burgos-Martinez told him "Fuck you, I have

been looking for you for a long time motherfucker." No one was disciplined as a result of this event.

132. Because officers knew that they could get away with not reporting the actual force they used or the injuries they caused or the circumstances in which they occurred, officers felt free to use excessive force that caused injuries.

133. The policies and customs of the City of Worcester led the defendants' in this case including, Officer Carlson, Sgt. Early, Smith, Williams, Bates, and Randall to think they could not be sanctioned for violating the rights of citizens by using unreasonable force, making arrests without probable cause, filing false reports and even testifying falsely in court and in other proceedings.

134. All of these policies and procedures were implicated during his arrest and were the moving force behind the Defendants' violations of Mr. Deptula's civil rights.

### COUNT I
### 42 U.S.C. § 1983: Unreasonable Force-Officer Bates, Carlson

135. Each of the foregoing paragraphs is incorporated by reference.

136. Defendants' used unreasonable force in arresting Mr. Deptula.

137. These actions deprived Mr. Deptula of well-established rights under the United States Constitution including freedom from arrest without probable cause, and freedom from the use of unreasonable force under the Fourth Amendment to the United States Constitution.

138. As a direct and proximate result of the foregoing, Mr. Deptula suffered the injuries described above.

## COUNT II
### 42 U.S.C. § 1983: Failure to Protect/Failure to Intervene/ Defendants Sgt. Early, Randall, Smith and Williams

139.   Each of the foregoing paragraphs is incorporated by reference.

140.   Defendants' Sgt. Early, Randall, Williams and Smith failed to protect or intervene to

prevent Mr. Deptula's from being assaulted even when they were in a position to do so.

141.   These actions deprived Mr. Deptula of well-established rights under the United States

Constitution including freedom from the use of unreasonable force under the Fourth

Amendment to the United States Constitution.

142.   As a direct and proximate result of the foregoing, Mr. Deptula suffered the injuries

described above.

## COUNT III
### Massachusetts Civil Rights Act, M.G.L. c. 112 § 11IM
### Smith

143.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

144.   Defendant Smith threatened and intimidated Mr. Deptula to teach him a lesson.

145.   Defendant violated Mr. Deptula's civil rights under Massachusetts law by threats,

intimidation and coercion.

146.   As a direct and proximate result thereof, the plaintiff suffered the injuries and damages as

described above.

## COUNT IV
### Assault and Battery
### Defendants' Bates, Carlson, Smith

147.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

148.   The above Defendants committed the tort of assault and battery against Mr. Deptula by

assaulting and battering him without legal justification, cause, excuse, or privilege.

21

149.    As a direct and proximate result thereof, the plaintiff suffered the injuries as described

        above.

## COUNT V
### 42 U.S.C. § 1983: Monell Claims Against City of Worcester and Supervisory Claims against Gemme and Sgt. Early/Supervisory Liability

150.    Each of the foregoing paragraphs is incorporated by reference.

151.    The policies and customs of the City of Worcester as described above were the moving

        force behind the violations of Plaintiff's constitutional rights by Defendants Carlson,

        Bates, Williams, Smith and possibly, Hanlon and O'Malley.

152.    The policies and customs of the City and its failure to train, investigate and discipline was

        the moving force behind the violations of Plaintiff's constitutional rights by Defendants.

## COUNT VI
### Civil Conspiracy
### Sgt. Early, Bates, Carlson, Randall, Williams, Smith

153.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

154.    These Defendants did conspire to hide Deptula's beating by preparing and submitting

        false police reports.

## COUNT VII
### Intentional Infliction Emotional Distress
### Sgt. Early, Bates, Carlson, Randall, Williams, Smith

155.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

156.    These Defendants did conspire to hide Deptula's beating by preparing and submitting

        false police reports.

157.    The conduct of the Defendants' named in this count constituted intentional infliction of

        emotional distress.

158. By their actions, defendants subjected Deptula to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

159. As a direct result of the intentional conduct of the defendants in this count, Ortiz suffered severe emotional distress and great pain of body and mind.

**Wherefore, Plaintiff hereby respectfully requests the following relief:**

1. All compensatory damages;
2. All punitive damages against Defendants;
3. Award costs of this action, including reasonable attorney's fees and
4. Award such other relief as the Court deems just and proper;
5.

## JURY DEMAND

Plaintiff requests trial by jury as to all issues of fact.

Respectfully submitted,
Plaintiff  LUKE DEPTULA
By his attorneys,

Hector E. Pineiro (BBO# 555315)
Robert A. Scott (BBO# 648740)
Law office of Hector E. Pineiro
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
hector@pineirolegal.com

Dated: March 30, 2017

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS                                    CIVIL ACTION NO.   17-0512D

LUKE DEPTULA                          )
                                      )
                                      )
          Plaintiff                   )
                                      )               FILED
                                      )
v.                                    )           MAR 30 2017
CITY OF WORCESTER, JEFFREY CARLSON,   )
JAMES E. BATES, KELLEN E. SMITH,      )         ATTEST: _____ CLERK
SGT. MATTHEW EARLY, DANA RANDALL,     )
LARRY WILLIAMS AND GARY GEMME         )
                                      )
          Defendants                  )
                                      )

## MOTION FOR APPOINTMENT OF SPECIAL SERVICE PROCESS SERVER
### [Mass. R. Civ. P. 4 (c)]

Now come the plaintiffs and as per Massachusetts Rule of Civil Procedure 4 (c) they requests this Honorable Court to appoint as process server in this action a constable of the Office of George & Associates, 390 Main Street, Worcester, MA, in order to assure a substantial savings in time. The undersigned affirms under the pains and penalties of perjury that to the best of his knowledge and belief the person to be appointed is a Constable experienced in the service of process and not a party to, or otherwise interested in, this action.

Respectfully submitted,
Plaintiff LUKE DEPTULA
By his attorneys,

Hector E. Pineiro (BBO# 555315)
Robert A. Scott (BBO# 648740)
Law office of Hector E. Pineiro
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
hector@pineirolegal.com

Allowed
Tucker J
ATTON
W. Smith
S/L
3-31-17

Dated: March 30, 2017   3/31/17
Notices Mailed

24

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS                                    CIVIL ACTION NO.

```
                                    )
LUKE DEPTULA                        )
                                    )
                                    )
        Plaintiff                   )
                                    )
v.                                  )
CITY OF WORCESTER, JEFFREY CARLSON, )
JAMES E. BATES, KELLEN E. SMITH,    )
SGT. MATTHEW EARLY, DANA RANDALL,   )
LARRY WILLIAMS AND GARY GEMME       )
                                    )
                                    )
        Defendants                  )
                                    )
```

## UNIFORM COUNSEL CERTIFICATE FOR CIVIL ACTIONS

I am an attorney of record for the Plaintiff Luke Deptula. In accordance with Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution, (SJC Rule 1:18) which states in part, ". . . Attorneys shall: provide their clients with this information about court-connected dispute resolution services, discuss with their clients the advantages and disadvantages of the various methods of dispute resolution, and certify their compliance with this requirement[,]" I hereby certify that I have complied with this requirement.

Respectfully submitted,
Plaintiff LUKE DEPTULA
By his attorneys,

Hector E. Pineiro (BBO# 555315)
Robert A. Scott (BBO# 648740)
Law office of Hector E. Pineiro
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
hector@pineirolegal.com

Dated: March 30, 2017

| CIVIL ACTION COVER SHEET | TRIAL COURT OF MASSACHUSETTS SUPERIOR COURT DEPARTMENT COUNTY OF   WORCESTER | DOCKET NO. _____ |
|---|---|---|

| PLAINTIFF(S) Luke Deptula | DEFENDANT(S) City of Worcester, Jeffrey Carlson, James E. Bates, Kellen E. Smith, Da_ Randall, Larry Williams & Gary Gemn_ |
|---|---|

| Plaintiff Atty | Hector E. Pineiro | Type Defendant's Attorney Name |
|---|---|---|
| Address | 807 Main Street | Defendant Atty | Kevin Gould ACS, Wendy Quinn ACS |
| City | Worcester | State MA Zip Code 01610 | Address | Law Department City of Worcester, 455 Main St |
| | | City | Worcester | State MA Zip Code 01608 |
| Tel. | +1 (508) 770-0600 | BBO# 555,315 | | |

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify)    TRACK | IS THIS A JURY CAS_ |
|---|---|---|
| E17 | Civil Rights Act G L c 12, s 11H - Average Track | [ ✓ ] Yes  [ ] No |

RECEIVED

MAR 30 2017

CLERK OF COURTS
WORCESTER COURT_

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages.  For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A.   Documented medical expenses to date:
1.   Total hospital expenses                                                                    $_____
2.   Total doctor expenses                                                                      $_____
3.   Total chiropractic expenses                                                                $_____
4.   Total physical therapy expenses                                                            $_____
5.   Total other expenses (describe)                                                            $_____
                                                                          Subtotal
B.   Documented lost wages and compensation to date                                             $_____
C.   Documented property damages to date                                                        $_____
D.   Reasonably anticipated future medical expenses                                             $_____
E.   Reasonably anticipated lost wages and compensation to date                                 $_____
F.   Other documented items of damages (describe)                                               $_____

G.   Brief description of plaintiff's injury, including nature and extent of injury (describe)   $_____

Plaintiff was repeatedly punched and assaulted by
police while in handcuffs. There is a reasonable likelihood    Total $  25,000+
his damages will exceed $25,000

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

|  |
|---|

TOTAL     $..............

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

AI hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods.
Signature of Attorney of Record _____         Date:   Mar 30, 2017
A.O.S.C. 3-2007

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

### * CONTRACTS

A01 Services, Labor and Materials F)
A02 Goods Sold and Delivered (F)
A03 Commercial Paper (F)
A08 Sale or Lease of Real Estate (F)
A12 Construction Dispute (A)
A99 Other (Specify) (F)
E03 Claims against Commonwealth (A)
    or Municipality

### *TORT

B03 Motor Vehicle Negligence (F)
    personal injury/property damage
B04 Other Negligence- (F)
    personal injury/property damage
B05 Products Liability (A)
B06 Malpractice-Medical (A)
B07 Malpractice-Other (Specify) (A)
B08 Wrongful Death, G.L. c.229, s.2A (A)
B15 Defamation (Libel-Slander) (A)
B19 Asbestos (A)
B20 Personal Injury- slip & fall (F)
B21 Environmental (F)
B22 Employment Discrimination (F)
B99 Other (Specify) (F)
E03 Claims against Commonwealth (A)

### * REAL PROPERTY

C01 Land Taking (eminent domain) (F)
C02 Zoning Appeal, G.L. c.40A (F)
C03 Dispute concerning title (F)
C04 Foreclosure of mortgage (X)
C05 Condominium Lien & Charges (X)
C99 Other (Specify) (F)
E03 Claims against Commonwealth (A)
    or Municipality

### EQUITABLE REMEDIES

D01 Specific Performance of Contract (A)
D02 Reach and Apply (F)
D06 Contribution or Indemnification (F)
D07 Imposition of a Trust (A)
D08 Minority Stockholder's Suit (A)
D10 Accounting (A)
D12 Dissolution of Partnership (F)
D13 Declaratory Judgment G.L. c. 231A (A)
D99 Other (Specify) (F)

### MISCELLANEOUS

E02 Appeal from Administrative
    Agency G.L. c. 30A
E03 Claims against Commonwealth
    or Municipality
E05 Confirmation of Arbitration Awards
E07 G.L. c.112, s.12S (Mary Moe)
E08 Appointment of Receiver
E09 General Contractor bond,
    G.L. c. 149, ss. 29, 29a
E11 Workers Compensation
E12 G.L.c.123A, s.12 (SDP Commitment)
E14 G.L. c. 123A, s. 9 (SDP Petition)
E15 Abuse Petition, G. L. c. 209A
E16 Auto Surcharge Appeal
E17 Civil Rights Act, G.L. c.12, s. 11H
E18 Foreign Discovery Proceeding
E19 Sex Offender Registry G.L. c. 178M,
    s. 6
E21 Protection from Harassment c 258E
E25 Plural Registry (Asbestos cases)
E95 **Forfeiture G.L. c. 94C, s. 47
E96 Prisoner Cases
E97 Prisoner Habeas Corpus
E99 Other (Specify)

*Claims against the Commonwealth or a municipality are type E03, Average Track, cases.
**Claims filed by the Commonwealth pursuant to G L c 94C, s 47 Forfeiture cases are type E95, Fast track.

TRANSFER YOUR SELECTION TO THE FACE SHEET.

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | (F) | [ X ] Yes   [ ] |

## SUPERIOR COURT RULE 29

**DUTY OF THE PLAINTIFF.** The plaintiff or his/her counsel shall set forth, on the face sheet (or attach additional sheets as necessary), a statement specifying in full and itemized detail the facts upon which the plaintiff then relies as constituting money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served on the defendant together with the complaint. If a statement of money damages, where appropriate is not filed, the Clerk-Magistrate shall transfer the action as provided in Rule 29(5)(C).

**DUTY OF THE DEFENDANT.** Should the defendant believe the statement of damages filed by the plaintiff in any respect inadequate, he or his counsel may file with the answer a statement specifying in reasonable detail the potential damages which may result should the plaintiff prevail. Such statement, if any, shall be served with the answer.

A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.

FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
MAY RESULT IN DISMISSAL OF THIS ACTION.