UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUKE DEPTULA,<br>    Plaintiff,<br><br>    v.<br><br>CITY OF WORCESTER, JEFFREY CARLSON,<br>JAMES E. BATES, KELLEN E. SMITH,<br>MATTHEW EARLY, and GARY GEMME<br>    Defendants. | CIVIL ACTION<br>NO. 17-40055-TSH |

## MEMORANDUM OF DECISION AND ORDER
### April 6, 2020

**HILLMAN, D.J.**

### Background

Luke Deptula ("Deptula" or "Plaintiff") has filed suit against the City of Worcester ("City"), Jeffrey Carlson ("Officer Carlson"), James E. Bates ("Officer Bates"), Kellen E. Smith ("Officer Smith"), Matthew Early (" Sgt. Early" and together with Officer Smith and Officer Bates, "Defendants"), and Gary Gemme ("Chief Gemme"), under 42 U.S.C. §1983 for violation of his constitutional rights (Count I for unreasonable force against Officers Bates and Carlson; Count II for failure to protect against Sergeant Early, and Officer Smith, and Count V against the City of Worcester under *Monell v. New York City Dep't of Social Services*, 486 U.S. 658, 98 S.Ct. (1978) and supervisory claims against Chief Gemme and Sgt.

Early). Deptula has also filed Massachusetts state law claims for violation of the Massachusetts Civil Rights Act ("MCRA", Mass.Gen.L. ch. 12, §§11H-I[1] (Count III against Officer Smith), and tort law claims for assault and battery (Count IV against Officers Bates, Carlson, and Smith), civil conspiracy (Count VI against Sgt. Early, Officers Bates, Carlson and Smith), and intentional infliction of emotional distress (Count VII against Sgt. Early, Officers Bates, Carlson and Smith)[2]. Specifically, Plaintiff alleges that when he was arrested, Officer Carlson punched him in the face multiple times and the other officers failed to intervene to stop the beating. This Memorandum and Order of Decision addresses the motions of Defendants Sergeant Early and Officers Bates and Smith for Partial Summary Judgment (Docket No. 85), and Plaintiff Luke Deptula's Motion For Partial Summary Judgment on Count I, Count II (Docket No. 88). For the reasons set forth below, Defendants' motion for partial summary judgment is *granted*, and Plaintiff's motion for partial summary judgment is *denied*.

---

[1] In the complaint, Plaintiff alleges a claim pursuant to the MCRA but ***again*** refers to "M.G.L. c. 112, § 11IM." Plaintiff's attorneys have been filing complaints in this Court citing to Chapter 112 *for years* and in multiple opinions, the Court has indicated to counsel that Massachusetts General Laws Chapter 112 deals with the registration of certain professions and occupations and that counsel obviously means to cite to Mass.Gen. L. ch. 12, § 11I, which deals with the violation of constitutional rights. Counsel has chosen not to fix this error. Moreover, the miscite is *repeated* in Plaintiff's memorandum in support of his motion for partial summary judgment. The Court has lost patience with counsel's failure to fix an obvious error despite repeated admonitions. The next time that a complaint is filed with this erroneous statutory reference, the Court will entertain a motion to dismiss such count out of hand *with prejudice.*
    Unfortunately, such sloppiness is indicative of many of the filings counsel makes in this Court. Later in this opinion, the Court points out other errors in Plaintiff's submissions. *See infra*, note 4. **Accordingly, I will *again* remind Plaintiff's counsel that they should review their submissions with significantly more care than they have to date.**
[2] The Complaint also named Officers Dana Randall and Larry Williams in Counts II (failure to intervene), VI (conspiracy) and VII (intentional infliction of emotional distress). These officers were dismissed from the case on May 10, 2018. *See* Docket No. 37.

2

## **THE CROSS-MOTIONS FOR SUMMARY JUDGMENT**

### **Standard of Review**

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine ,issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case." *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152*.* "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or " improbable inferences". *Id.* (citation to quoted

case omitted). " ' The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted). "Cross-motions for summary judgment require the district court to 'consider each motion separately, drawing all inferences in favor of each non-moving party in turn.' " *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014)(citation to quoted case omitted).

### **Facts**[3]

### Defendants' Version of the Events

At all relevant times, Officer Smith was an officer with the Worcester Police Department ("WPD") Vice Squad. While conducting an investigation, Officer Smith identified Deptula as the head of a retail-level oxycodone distribution organization operating in the Worcester area with his brother, Daniel Deptula ("Daniel"), and then girlfriend, Allie Marsden ("Marsden"). The investigation involved multiple controlled buys of illegal drugs from Deptula. On Monday, March 31, 2014, Officer Smith obtained search warrants from a Worcester District Court Clerk Magistrate for a search of Deptula's residence at 3A Millbrook Street, Worcester, and his vehicle. Once the search warrants were obtained, Vice Squad officers went to 3A Millbrook Street, and to Deptula's parent's house on Santoro Road, Worcester where his car was parked.

---

[3] Plaintiff has asserted numerous facts which are relevant only to his claim against the City under *Monell*. Since the Court granted Defendants' motion to bi-furcate the trial, the Court will not address Plaintiff's *Monell* claim against the City or his supervisory claim against Chief Gemme and Sgt. Early when considering the cross-motions for summary judgment. If a trial of claims against the City and/or Chief Gemme and Sgt. Early becomes necessary, the Court will grant the parties an opportunity to file dispositive motions on these claims. Additionally, the Plaintiff has asserted numerous other facts that under the broadest definition of the term, are not relevant to the parties' motions. Except for a brief summary of the WPD's use of force policy to provide context, such facts also will not be considered.

At approximately 2:05 p.m., Vice Squad officers observed Deptula driving away from his parents' house. They followed him to the parking lot of L&M Tire, a car repair business located at 598 West Boylston Street, Worcester. After Deptula pulled into the parking lot, he got out of the vehicle. According to Officer Carlson, he was talking on his cell phone. Officer Smith, who was not at the scene at that time, communicated to the officers who were present to stop Deptula. Officers Carlson and Bates approached Deptula and it appeared to Officer Carlson that they startled him. As he approached Deptula, Officer Carlson was displaying handcuffs, his badge, a firearm and police radio. Bates's police badge was visible as he got out of his vehicle to approach Deptula.

Officer Bates took Deptula's cell phone and walked away from him. Deptula then pulled a fake thumb off his finger and Officer Carlson observed him place multiple small, light-colored items into his mouth. Based on his experiences and the information learned through the investigation, Officer Carlson believed that Deptula was ingesting illegal narcotic pills. In Carlson's experience, it's not unusual for people carrying illicit drugs to attempt to swallow them to get rid of incriminating evidence. Deptula continued to chew the pills and turned away from the officers. Officer Carlson forced Deptula to the hood of his vehicle. Officer Bates, who also saw Deptula remove the false thumb, did not assist him. The false thumb was seized as evidence. Officer Carlson reported that he then delivered two open hand palm strikes to the right side of Deptula's face to dislodge the evidence so that Deptula would not swallow it and to prevent it from being destroyed. Officer Carlson described his actions (of hitting Deptula with his palm) as a distraction technique to try to get him to spit out the drugs. Deptula was chewing and swallowing the pills, causing a white chalky substance to be

5

visible on his lips and tongue. Officer Carlson was not sure if Deptula put more than one pill in his mouth and Officer Bates saw Deptula put at least one pill in his mouth but could not see what color it was. Officer Bates was not sure that Deptula was on his phone when they approached. Officer Carlson stated that he believes Officer Bates was still at the scene and assisted him in handcuffing Deptula. According to Officer Bates, once he took Deptula's phone, he was no longer involved and did not see any use of force by Officer Carlson on Deptula. Deptula was placed into handcuffs and asked if he wanted medical attention, which he declined.

Deptula was "handcuffed, standing up [and] compliant" when Sgt. Early arrived. Officer Smith did not arrive at the scene until Deptula was already in handcuffs. Deptula did not complain to Officer Smith or Sgt. Early that he had been struck. Officer Smith transported Deptula in his police vehicle to 3A Millbrook Street where the search warrant was being executed. Officer Smith wanted to get Deptula away from the scene quickly because they were drawing attention and he feared that the persons at the Millbrook Street residence would be alerted. Oxycodone pills and marijuana were found at the residence during the search and following the execution of the search warrants, Deptula and Marsden, who was present at the residence werearrested.. Prior to being transported to the Worcester PD Deptula was asked again if he needed medical attention. He declined and stated that he did not have any injuries.

During booking at the WPD, Deptula when asked again, denied that he was sick or injured. He did not exhibit any visible injuries. Deptula has testified that he didn't "know" if he had any visible injuries but was in pain. No visible injuries can be seen on Deptula's booking photographs which include clear views of Deptula's ears. After his arrest and court

appearance. Deptula was detained as a pretrial detainee in the Worcester County Jail ("WCJ") in connection with his March 31, 2014 arrest and another criminal matter.

## Deptula's Version of the Events

According to Deptula, once he got to the parking lot of L&M Tire, he exited his vehickle to smoke, leaving his cell phone inside. While smoking, he saw somebody parked nearby in an old truck. A couple of seconds later, the person in the truck (later identified as Officer Bates) got out and ran towards him, grabbed him by the throat, threw him on the hood of his car and handcuffed him. Other officers assisted Officer Bates. He also asserts that prior to being thrown against the hood of the car and handcuffed, Officer Bates placed Deptula in a chokehold. Deptula contends that he did not put any pills in his mouth and was not attempting to swallow anything. Deptula asked what was going on and recognized Officer Smith. Officer Bates said "there was nothing here, and somebody said because he ate them all." Officer Carlson said "you ate them all, you fucking pussy." Deptula testified that he then felt "two-two, two hits to the right of my ear and I was like, did somebody just hit me? Officer Bates leans me back on the hood of the car and says, nobody hit you, buddy, straighten your back up, in a calm voice. And I was like, somebody definitely just hit me, and right away, boom-boom, two more times to the same ear (with a closed fist) and that's when I was like, what the hell are you guys doing? What are you hitting me for? And that's when Officer Smith said, we're causing a scene. He grabs me, throws me in the back of his seat and drives me off." According to Deptula, Sgt. Early was also present at the time of his arrest. Deptula disputes that anyone ever offered him medical attention. Moreover, he contends that while Officer Smith was driving him to his residence on Millbrook Street (about a two minute drive) he was

7

in pain and his body leaned over. Officer Smith asked him what was wrong and after Deptula

told him another officer had hit him four times, Officer Smith flexed his arm and fist,

threatened to hit him and swung at him.

At the WCJ, Deptula put in a sick slips complaining of pain in his head and ringing in

his ears. He did so after someone mentioned he had a black mark on his face. His first sick

slip, submitted on April 3, 2014, complained that he was suffering from withdrawal. His

second slip, submitted on April 6, 2014, complained that he was having trouble sleeping and

suffered from migraine headaches. His third slip, submitted on April 9, 2014, in addition to

mentioning his problem with withdrawal, mentions for the first time a bruise on his face and

that his ear hurt; he attributes both to a beating he suffered on the day of his arrest. His fourths

slip, submitted on April 20, 2014, complains of ringing in his ears which he attributes it to the

events of his arrest. Generally, the nurses who saw Deptula reiterated the history he provided

them. On April 20th, the nurse reported seeing a small bruise near his jawline that was

resolving and no evidence of external trauma with respect to his ear.

<u>Defendants' Background and the WPD use of Force Policy</u>

Officer Jeffrey Carlson became a police officer in 2004 and was a member of the

WPD Vice Squad from the summer of 2008 through approximately October 2017. At the

police academy, he was trained on criminal law, constitutional law, basic narcotics, use of

force, domestic violence, defensive tactics and motor vehicle training. He had also taken part

in an 80 hour drug investigation course run by the Drug Enforcement Agency, a forty hour

course on street crimes (concentrating on drug offenses) and received on the job training.  As

a member of the Vice Squad, he investigated drug and prostitution offenses but the majority

8

of his time (about 90 percent) was spent investigating drugs. He had been involved in 75 to 100 cases where the suspect tried to swallow drugs such as heroin, crack and/or pills (such as opiates, percocet, oxycodone, and suboxone). He had personally used force approximately 25-39 times to prevent someone from swallowing drugs—most of the time, the force utilized was grabbing someone's cheeks and squeezing them.

Officer Smith has also encountered individuals that swallowed drugs while working with the Vice Squad including Class A, B and C substances and pills (including opiates). Officer Smith would attempt to prevent such individuals from swallowing such substances including by using his hands. He testified that officers would apply force at a pressure point on the side of the jaw to prevent the person from swallowing, place the person in a position where it was difficult to swallow or insert fingers in someone's mouth and apply pressure to the "jaw joint" in front of the ear. According to Officer Smith, the goal was not to cause pain, but to prevent the subject from swallowing something that could be harmful to the person or constitute evidence.

Sgt. Early testified during his 10 years on the Vice Squad, he witnessed people swallowing drugs "many times" during encounters with police and had observed WPD officers using force to stop individuals from swallowing drugs, including pinching the suspect's nose closed, spraying the suspect with pepper spray and applying pressure to the jaw area. Sgt. Early feels it is appropriate to strike a suspect in the face to dislodge the drugs. Other officers who are not parties to the suit but were present at the arrest scene have testified similarly.

On March 31, 2014, the WPD's use of force policy permitted officers to use nondeadly force to bring an unlawful situation under control. Chief Gemme did not believe that this provision allowed officer to deliver strikes to someone's face unless the officer faced aggressive resistance or assaultive behavior by the suspect. Other high ranking WPD officials dispute that the police as written in 2014 would not have permitted use of force such as striking an individual to prevent the swallowing of drugs. After this incident, the WPD use of force policy has been amended to bar the use of force to stop drug ingestion unless the suspect is assaultive towards the police.

## **Discussion**

Deptula's claims arise out his arrest by the WPD in connection with an ongoing drug investigation. He seeks partial summary judgment on his claims that Officer Carlson violated his rights under the Fourth Amendment by using excessive force in connection with effectuating that arrest, that Officer Carlson committed an assault and battery against him, and his *Monell* and supervisory claims against the City and Chief Gemme. Defendants seek summary judgment on all claims against them. Initially, the Court will address Plaintiff's motion for summary judgment.

### Plaintiff's Motion for Partial Summary Judgment[4]

Deptula seeks summary judgment against Officer Carlson on Count I (§1983 excessive force), and against Officer Carlson on Count IV (tort claim for assault and battery),

---

[4] The captions of Plaintiff's motion and supporting memorandum indicate that he is seeking partial summary judgment on Counts I and II, yet he makes no substantive argument regarding his entitlement to summary judgment on Count II. Instead, in those submissions Deptula asserts that he is seeking partial summary judgment on *Counts I, IV and V*. Additionally, in his memorandum in support of his motion, Plaintiff on one occasion refers to himself as "Lachance." The Court mentions these errors in conjunction with its comments in note 1, *supra*.

and against the City, former Chief Gemme and Sgt. Early on Count V (§ 1983 *Monell* and supervisory claim)[5] because Officer Carlson allegedly violated the WPD policy regarding use of force during his arrest, and that Carlson was not properly trained as to the type and amount of force to use when an individual swallows illegal substances.. Plaintiff fails to appreciate that these arguments while possibly relevant to his *Monell* claim, are not relevant to his claims against Officer Carlson. Instead, the question before the Court is whether Officer Carlson's striking him to prevent him from swallowing illegals drugs is a constitutional violation irrespective of whether Officer Carlson followed (or did not follow) the WPD's use of force policy. Put another way, the issue before the Court is whether Officer Carlson's use of force against Deptula constitutes a Fourth Amendment violation, as a matter of law.[6]

> " '[A]ll claims that law enforcement officers have used excessive force … in the course of an arrest" are to be decided under a Fourth Amendment standard of reasonableness, the proper application of which "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " The standard is an objective one: 'An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use force constitutional.' 'The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' The analysis is confined to the totality of the circumstances known to the officers at the time the decision to use force was made. The fact that force was used is not, in and of itself, dispositive. 'Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some

---

[5] The Court will not consider Plaintiff's motion for summary judgment on Count V (§1983 against the City, Chief Gemme and Sgt. Early) at this time. *See* note 3, *supra*.

[6] In order to establish his § 1983 claims against the Defendants, Deptula must first establish that a person acting under the color of law denied him a right secured by the constitution or by federal law. There is no dispute that the Defendants were acting under the color of law and therefore, that element of Deptula's claims will be deemed satisfied for purposes of all parties' motions.

11

degree of physical coercion or threat thereof to effect it.' The issue rather is whether the amount of force used was reasonable under the circumstances. Reasonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' "

*Farrah ex. rel Estate of Santana v. Gondella*, 725 F.Supp.2d 238, 244-45 (D.Mass. 2010)(internal citations and citation to quoted cases omitted).

Where a suspect is attempting to swallow pills or other illicit drugs, the government has an interest in preventing a potential drug overdose and preserving evidence. These are legitimate law enforcement interests which may justify the use of some force under some circumstances. Accordingly, numerous courts have upheld the use of physical force by an officer to prevent a suspect from swallowing drugs or otherwise attempting to destroy evidence in order to preserve such evidence and/or for the safety of the suspect. *See e.g.*, *Morris v. Tulsa Police Dep't*, No. 09–CV–797–JHP–TLW, 2011 WL 1542920, at *5 (N.D.Okla. Apr. 21, 2011)(upholding use of Taser where plaintiff ingested cocaine in attempt to destroy evidence and fought with police officers); *Barber v. Santa Maria Police Dep't*, No. CV 08–6273–DMG (MLG), 2010 WL 5559708, at *8 (C.D.Cal. Sept. 1, 2010) (finding knee strikes to plaintiff's neck and face objectively reasonable where plaintiff refused to obey officers' orders during strip search, attempted to stuff the contents of a bag down a drainage pipe, and resisted officers' efforts to restrain the plaintiff); *Simms v. City of Harrodsburg*, No. 06–CV–104–JMH, 2007 WL 2792174, at *4 (E.D.Ky. Sept. 21, 2007) (finding that dragging suspect who was attempting to destroy evidence of methamphetamine manufacture during execution of search warrant was objectively reasonable to stop plaintiff from destroying evidence and resisting arrest); *Singleton v. City of Newburgh*, 1 F.Supp.2d 306, 313–15 (S.D.N.Y.1998)(it is clear that person has no constitutional right to secrete evidence; degree

of force that may be used in attempting to seize secreted evidence must be balanced with legitimate goals of law enforcement, and determined in light of totality of circumstances; finding discharge of pepper spray reasonable to induce an arrestee to spit out contraband).

Prevailing case law establishes that it is reasonable for an officer to strike an arrestee to dislodge drugs from the arrestee's mouth so long as the force used is not beyond that minimally necessary to prevent the arrestee from ingesting such drugs. Viewing the facts in the light most favorable to Officer Carlson, Deptula removed a fake thumb and inserted something which had been secreted therein in his mouth. Based on his experience and investigation of Deptula, Officer Carlson reasonably believed that Deptula had put illegal narcotics, *i.e.*, pill(s) into his mouth. He then struck Deptula in the face two times in quick succession with an open hand in order to dislodge the pills he was swallowing. As stated previously, police officers have a lawful interest in preventing the destruction of evidence and protecting the safety of the suspect who could face dire consequences upon swallowing illicit drugs. The Court cannot find that the force which Officer Carlson used exceeded that which was reasonably necessary to dislodge the pills from Deptula's mouth. Plaintiff's motion for summary judgment on Count I is denied.

As to Deptula's assault and battery claim against Officer Carlson, Massachusetts law allows for assault and battery claims against police officers who use excessive force in conducting an arrest. At the same time, Massachusetts law also allows an officer to use reasonable force in conducting a lawful arrest. Where, such as in this case, a plaintiff alleges both a §1983 excessive force claim and common law claim for assault and battery, the

determination of the reasonableness of the force used under §1983 controls the determination of the reasonableness of the force used under the common law assault and battery claims. *Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010). Accordingly, Deptula's motion for summary judgment is also denied with respect to his assault and battery claim (Count IV).

<u>Defendants' Motion for Summary Judgment</u>

<u>Counts I and II: Whether any Defendant Violated Plaintiff's Constitutional Rights By Using Excessive Force Against Him During His Arrest And/Or By Failing To Intervene In Officer Carlson's Use of Force</u>

The Court has previously stated the standard for establishing Deptula's claim in Count I for direct violation of his Fourth Amendment Right to be free from excessive force. In Count II, Deptula asserts a §1983 claim for failure to intervene. Under this theory, a police officer:

> who fails to take reasonable steps to protect the victim of another officer's use of excessive force may be held liable under section 1983 on a failure to intervene theory. … the 'failure to intervene' rule applies only when an officer has 'a realistic opportunity to intercede.'

*Farrah*, 725 F.Supp.2d 238, 244-45, at 246. Officer Bates (the only one of these Defendants named in Count I) argues that he is entitled to summary judgment on Count I because Deptula has not alleged any facts which would support a finding that he utilized force against him and therefore, he cannot state a claim against him for a direct violation of his constitutional rights. As to Count II, Sgt. Early and Officer Smith (the only of these Defendants named in this Count), assert that they are entitled to summary judgment on Deptula's §1983 failure to intervene claim because they had no realistic chance to intercede to prevent Officer Carlson from striking him. In the alternative, the Defendants argues that they are entitled to qualified immunity on these claims.

I agree with the Defendants that on the record before me, there is no genuine issue of material fact regarding Deptula's allegations against Officer Bates in Count I or Sgt. Early and Officer Smith in Count II. More specifically, there is no evidence to support a finding that the force Officer Bates used against Deptula (grabbing him by the throat while pushing him against the hood of the car and briefly placing him in a chokehold) was unreasonable under the circumstances. As to Deptula's claims in Count II against Sgt. Early and Officer Smith, by his own testimony, the events of which he complains took place in a matter of seconds. More specifically, Officer Carlson allegedly hit him four times in quick succession-- after the first two hits, Officer Bates was talking to him calmly when two more hits came "right away." There is not a scintilla of evidence that would support a finding that either of them was in position to stop Officer Carlson's alleged attack. Accordingly, the Defendants' motion for summary judgment is granted on Counts I and II.

Count III: Whether Deptula has established his MCRA Claim against Officer Smith

To establish a claim under the MCRA, Deptula must prove that his exercise or enjoyment of rights secured by the constitution or laws of either the United States or Massachusetts has been interfered with. *See* Mass. Gen. L. ch. 12, § 11I. The MCRA is the state "counterpart" to Section 1983 and, in general, is coextensive therewith. The primary difference is that to succeed on an MCRA claim, a plaintiff must also show that the violation of rights occurred "by threats, intimidation or coercion." *Bally v. Northeastern Univ.,* 403 Mass. 713, 532 N.E.2d 49, 52 (1989). "A 'threat' means the 'intentional exertion of pressure to make another fearful or apprehensive of injury or harm.' " *Goddard v. Kelley,* 629 F.Supp.2d 115, 128 (D.Mass. 2009)(citation to quoted case omitted). "Intimidation" means

putting a person in fear for the purpose of compelling or deterring his or her conduct. *Id.* "Coercion" means application of physical or moral force to another to constrain him to do against his will something he would not otherwise do. *Id.*

Little need be said about this claim. Deptula asserts that while Officer Smith was driving him to his residence where a search was underway, he turned around (in response to Deptula stating that another officer had beaten him), raised his fist, threatened to punch him and made a swinging motion. Assuming that Officer Smith's actions constituted a threat, intimidation and/or coercion, his conduct while perhaps boorish, simply does not rise to the level of a constitutional violation. The Defendants' motion for summary judgment on Count III is granted.

<u>Count IV: Whether Deptula has established a Claim for Assault and Battery against Officers Bates and Smith</u>

For the same reasons that I find Deptula's §1983 claims against Officers Bates and Smith fail, his claim for assault and battery against them also fails, *i.e.*, none of the Defendants used any force against him that was beyond that which was reasonable under the circumstances and/or had a reasonable opportunity to intervene in another officer's use of force against him. Defendants' motion for summary judgment is granted as to Count IV.

<u>Count VI: whether Deptula has established a Claim for Conspiracy against the Sgt. Early and Officers Bates and Smith</u>

In their supporting memorandum, Defendants state that it is unclear whether Count VI of the Plaintiff's complaint asserts a claim for conspiracy under §1983 or a common law conspiracy claim. In his opposition, Plaintiff contends that he is asserting a claim under §1983 for conspiracy to violate his constitutional right to be free from excessive force. First, were

Deptula proceeding pro se, the Court would be required to construe his claims liberally, that is, the Court will make the necessary inferences where the allegations suggest an actionable claim. However, Deptula is represented by counsel and therefore, is expected to state his claims in such a way that the cause of action is readily discernible to both the Court and the Defendants. Plaintiff's complaint asserts only a conclusory claim for common law conspiracy whereby the Defendants and Officer Carlson allegedly conspired to file false police reports. However, in his opposition, he now contends that the Defendants and Officer Carlson conspired to violate his civil rights under §1983 by using excessive force against him. A plaintiff cannot in his opposition recharacterize the nature of his claim and judgment against him is warranted on this claim for that reason alone. In any event, as pointed out by the Defendants, there is no evidence in the record which would support a finding that there was an agreement by the Defendants and Officer Carlson to violate his civil rights. Therefore, summary judgment shall enter for the Defendants on this claim. Moreover, if the Court were to consider Deptula's claim as one for common law conspiracy, Defendants are entitled to summary judgment because given his arguments in his opposition, I find that he has waived any such claim, and, for the reasons set forth below, such claim fails.

Under Massachusetts law, there are two types of civil conspiracy claims: The first requires proof of coercion, while the second requires proof of a common plan to commit a tortious act. "Under the first type of conspiracy, a plaintiff must allege that the defendant and others combined to have a special coercive power that they did not possess individually. To state a claim for the second type of conspiracy, the plaintiff must allege 'first, a common design or an agreement, although not necessarily express, between two or more persons to do

a wrongful act and, second, proof of some tortious act in furtherance of the agreement.' " *Farrah*, 725 F. Supp. 2d at 248–49. Since Deptula is presumably preceding under the second theory (as noted previously, the complaint simply alleges that the Defendants and Officer Carlson conspired to file false police reports), he must prove that the Defendants and Officer Carlson acted pursuant to an agreement, " '[i]t is not sufficient to prove joint tortious acts of two or more persons.... '" *Gutierrez v. Massachusetts Bay Transp. Authy.*, 437 Mass. 396, 415 (2002)(citation to quoted case omitted). As again pointed out by the Defendants, there is no evidence in the record which would support a finding that Defendants and Officer Carlson conspired to hide his alleged beating by filing false police reports.[7]

<u>Count VII: whether Deptula has established a Claim for Intentional Infliction of Emotional Distress against Sgt. Early and Officers Bates and Smith.</u>

In order to recover damages for intentional infliction of emotional distress, a plaintiff must prove that "(1) the defendant intended to inflict emotional distress or knew or reasonably should have known that emotional distress was likely to result from such conduct; (2) the conduct was 'extreme and outrageous,' 'beyond all possible bounds of decency,' and 'utterly intolerable in a civilized community'; (3) the defendant's conduct proximately caused plaintiff's emotional distress; and (4) the distress was so 'severe that no reasonable man could be expected to endure it.' " *Davignon v. Clemmey*, 322 F.3d 1, 8 n.2 (1st Cir. 2003) (quoting *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145 (1976)).

---

[7] Although Officer Carlson has not moved for summary judgment on this claim, the Court was inclined to *sua sponte* grant judgment in his favor. Because Fed.R.Civ.P. 56(f) provides I must give Deptula notice before doing so, I will instead advise Plaintiff that he should review his complaint and the factual record in support of this claim and carefully consider whether to proceed with this claim against Officer Carlson at trial.

I agree with the Defendants that taking the facts in a light most favorable to Deptula, there is no evidence to support a finding that their actions rose to the level of extreme and outrageous conduct beyond all bounds of decency or their alleged behavior that is of the type that is "utterly intolerable in a civilized community." Accordingly, Defendants' motion for summary judgment on this claim is granted.

## Conclusion

It is hereby Ordered that:

1. Defendant's Motion For Partial Summary Judgment (Docket No. 85), is ***granted***; and

2. Plaintiff Luke Deptula's Motion For Partial Summary Judgment on Counts I, Count II (Docket No. 88) is ***denied***.

>  /s/ *Timothy S. Hillman*
>  **TIMOTHY S. HILLMAN**
>  **DISTRICT JUDGE**